Steven R. ARCH, et al.,

v.

THE AMERICAN TOBACCO COMPANY, INC., et al.

No. CIV. A. 96–5903.

United States District Court, E.D. Pennsylvania.

June 3, 1997.

---

Stephen A. Sheller, Sheller, Ludwig, & Badey, Philadelphia, PA, Thomas E. Mellon, Jr., Mellon, Webster & Mellon, Doylestown, PA, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Sherrice A. Knisely, Sheller, Ludwig & Badey, Philadelphia, PA, Julia W. McInerny, Coale & Van Susteren, Washington, DC, Gary Robert Fine, Rodham & Fine, P.A., Fort Lauderdale, FL, Dianne M. Nast, Roda & Nast, P.C., Lancaster, PA, for Plaintiffs.

Edward F. Mannino, Wolf, Block, Schorr, & Solis–Cohen, Philadelphia, PA, Peter S. Greenberg, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for The American Tobacco Company, Inc., American Brands, Inc., Brown & Williamson Tobacco Corporation.

Hugh R. Whiting, Jones Day, Reavis & Pogue, North Point, Cleveland, OH, Morton F. Daller, Tracy Canuso Nugent, Daller, Greenberg & Dietrich, Fort Washington, PA, for R.J. Reynolds Tobacco Company and RJR Nabisco, Inc.

Judy L. Leone, Dechert, Price & Rhoads, Philadelphia, PA, Thomas Finarelli & Gray, Philadelphia, PA, for B.A.T. Industries P.L.C.

Judy L. Leone, Robert C. Heim, Christine C. Levin, Ronni Ellen Fuchs, Dechert, Price & Rhoads, Philadelphia, PA, for Philip Morris, Inc.

Howard M. Klein, William J. O'Brien, Conrad, O'Brien, Gellman & Rohn, Philadelphia, PA, for Lorillard Tobacco Company and Loews Corporation.

Judy L. Leone, Dechert, Price, & Rhoads, Philadelphia, PA, Madeline M. Sherry, Stephen J. Imbriglia, Hecker, Brown, Sherry & Johnson, Philadelphia, PA, for United States Tobacco Company and Ust, Inc.

Joseph W. Fullem, Jr., Patrick W. Kittredge, Gary M. Marek, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, for Council for Tobacco Research–U.S.A.

J. Kurt Straub, Abrahams, Lowenstein, Bushman & Kaufman, Philadelphia, PA, for Liggett Group, Liggett & Meyers, Inc. and Brooke Group, LTD.

Matthew L. Myers, National Center for Tobacco Free Kids, Washington, DC, for Respondents.

### MEMORANDUM

NEWCOMER, District Judge.

Presently before this Court are plaintiffs' Motion for Class Certification, and defendants' response thereto, and plaintiffs' reply thereto, and the parties' post-hearing memoranda, and the parties' supplemental briefs, and the various exhibits in support of the aforementioned.[1] In addition, a class certification hearing was held on March 6, 1997, during which the Court heard oral argument in support of and in opposition to plaintiffs' motion. For the following reasons, the Court denies plaintiffs' motion.

### I. Introduction

This case follows hard and fast on the heels of the United States Court of Appeals for the Fifth Circuit's decertification of a nation-wide class of nicotine-addicted cigarette smokers. See Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir.1996). Subsequent to the Fifth Circuit's decertification in Castano, plaintiffs[2] filed a Complaint in state court against defendants.[3] On Au-

---

1. The American Heart Association, The American Cancer Society and The American Lung Association have filed an amici curiae brief.

2. The plaintiffs are Steven R. Arch, William Barnes, Ciaran McNally, Catherine Potts, Norma Rodweller, Barbara Slazman, Edward J. Slivak and John Teagle. By letter of January 16, 1997, plaintiffs' counsel notified defendants that they were withdrawing Mr. Teagle as a named plaintiff in this action.

3. The defendants are The American Tobacco Company, Inc., American Brands, Inc., R.J. Reynolds Tobacco Company, RJR Nabisco, Inc., Brown & Williamson Tobacco Corporation, Batus, Inc., Batus Holdings, Inc., B.A.T. Industries P.L.C., Philip Morris, Inc., Philip Morris Companies, Inc., Lorillard Tobacco Company, Inc., Lorillard, Inc., Loews Corporation, United States Tobacco Company, UST, Inc., The Tobacco Institute, Inc., The Council for Tobacco Research–

gust 27, 1996, this action was removed from state court. Plaintiffs filed a "First Amended Complaint—Class Action" on December 2, 1996.

Plaintiffs allege, in essence, that this action arises out of a common course of conduct on the part of defendants who have designed, researched, tested, manufactured, promoted and sold cigarettes to Pennsylvanians, including the plaintiffs herein, well aware that their products contain hazardous substances. Plaintiffs further allege that defendants have consistently and publicly denied that cigarettes are hazardous and addictive, while aware that the results of their own internal research demonstrate the addictive qualities of nicotine, and have accordingly manipulated that level of nicotine in their cigarettes with the intent and for the commercial purpose of creating and sustaining plaintiffs' addiction to their product.

As a result of defendants' conduct, plaintiffs assert that one million or more Pennsylvanians suffer from an addiction similar in severity to that suffered by users of heroin and cocaine. It is alleged that this addiction, in turn, continuously exposes these putative class members to other hazardous and toxic substances contained in defendants' products. Plaintiffs claim that this addiction is a condition that requires medical monitoring in the form of diagnostic and treatment services. Plaintiffs allege that through smoking they are continuously exposed to hazardous substances in cigarettes which places them at a substantially and measurably enhanced risk for specific smoking-related diseases. Plaintiffs maintain that medical monitoring is necessary to prevent, or reduce, diagnose and treat such diseases.

Plaintiffs' First Amended Complaint alleges the following causes of action: (1) medical monitoring; (2) intentional exposure to a hazardous substance; (3) negligence; and (4) strict products liability. Count five of plaintiffs' First Amended Complaint avers that defendants acted in concert or pursuant to a common design.

Plaintiffs seek the following relief: (1) certifying this action as a class action; (2) or-dering defendants to implement a Court supervised or Court-approved program to medically monitor class members; (3) an award of punitive damages, to be used for common class-wide purposes, including, without limitation, medical research on the diseases that cigarettes cause and the treatment of those diseases, medical research into the addiction, public education campaigns about the health hazards of cigarettes smoking, and programs to assist class members in efforts to quit smoking; (4) awarding such other monetary and injunctive relief as the Court deems just and proper; and (5) awarding the costs of the suit.

Plaintiffs request certification of the following class:

All current residents of Pennsylvania who are cigarette smokers as of December 1, 1996, and who began smoking before age 19, while they were residents of Pennsylvania.

Plaintiffs argue that the general requirements of Fed.R.Civ.P. 23(a)(1)–(4) are satisfied. Plaintiffs also contend that class certification is proper under Fed.R.Civ.P. 23(b)(3). In addition, plaintiffs asseverate that their medical monitoring claim can be properly certified under Fed.R.Civ.P. 23(b)(2). Alternatively, plaintiffs seek issue certification under Fed.R.Civ.P. 23(c)(4). Defendants, advancing a multi-pronged argument, oppose certification under any section of Rule 23.

II. *Discussion*

Federal Rule of Civil Procedure 23(c)(1) provides that class certification shall be determined "as soon as practicable after the commencement" of the action. Fed. R.Civ.P. 23(c)(1). A determination of class certification does not focus on whether plaintiffs have stated a cause of action or will prevail on the merits but rather is limited exclusively to whether the requirements of Rule 23 have been satisfied. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974); *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 252 (3d Cir.1975); *Sala v. National R.R. Passenger Corp.,* 120 F.R.D. 494, 495 (E.D.Pa.1988).

U.S.A., Inc., Liggett Group, Inc., Liggett & Myers, Inc. and Brooke Group, Ltd.

This determination is vested in the sound discretion of the trial court. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 2202, 68 L.Ed.2d 693 (1981); *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 471–72 (5th Cir.1986). Since the court may amend an order granting class certification, *In re School Asbestos Litigation,* 789 F.2d 996, 1011 (3d Cir.1986), in a close case the court should rule,in favor of class certification. *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970).

To obtain class action certification, plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met. *Wetzel,* 508 F.2d 239.

### A. Rule 23(a) Requirements

Rule 23(a) provides that:

One or more members of the class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)(1)–(4).

The United States Court of Appeals for the Third Circuit has succinctly explained the purposes for which Rule 23(a) was created: "The requirements of Rule 23(a) are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). The numerosity requirement addresses the concern of necessity, and the final three requisites are applied in order to determine "whether the class action can be maintained in a fair and efficient manner." *Id.*

### 1. Numerosity

■ The district court can make a common sense determination whether it would be difficult or inconvenient to join all class members as named parties under the particular circumstances of a case. *See, e.g., Senter v. General Motors Corp.,* 532 F.2d 511, 523 (6th Cir.1976); *Peil v. National Semiconductor Corp.,* 86 F.R.D. 357, 365 (E.D.Pa.1980). The Third Circuit has held that joinder is impracticable even where the class is composed of less than one hundred members. *See Weiss v. York Hosp.,* 745 F.2d 786, 808 (3d Cir.1984).

In this case, the class consists of what is believed by plaintiffs to consist of more than one million residents of Pennsylvania.[4] In light of the vast numbers of persons who potentially fall within the class definition, defendants do not dispute that numerosity is satisfied, nor should they.[5] Thus, the Court finds that the numerosity prong of Rule 23(a) is satisfied.

### 2. Commonality

■ Before the Court determines whether plaintiffs have satisfied the commonality requirement, the Court must first address whether the standard for commonality has been modified by the Third Circuit's decision in *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d. Cir.), *cert. granted,* — U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996).[6]

In *Georgine,* the Third Circuit recognized that some of its prior cases have "stated a very low threshold for commonality." *Id.* In *Baby Neal,* the Third Circuit stated that "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal,* 43 F.3d at 56. And, in *School Asbestos Litigation,*

---

4. In defendants' post–hearing memorandum, defendants place the number of potential class members at 2.8 million Pennsylvania residents. (Defs.' Post–Hr'g Mem. at 8). Despite this major discrepancy, it is obvious that this Court is dealing with a putative class of enormous proportions.

5. Defendants do however argue that the class is, in fact, so numerous that it is unmanageable and cannot be certified. The Court will address this argument below.

6. *Certiorari* was granted only on the issue of whether a court may utilize a different standard in determining whether to certify a settlement class as opposed to a litigation class.

789 F.2d at 1010, the Third Circuit stated that "the 'threshold of commonality is not high.'" (citation omitted). In *Georgine,* the Third Circuit noted that *Baby Neal* involved a class action for injunctive relief, thus raising fewer individualized questions, *Georgine,* 83 F.3d at 627, and *School Asbestos Litigation* upheld the certification of a national class "on the ground that the case involved only property damages." *Id.* (citation omitted). The Third Circuit, in contrast to these cases, held that "the commonality barrier is higher in a personal injury damages class action, like [*Georgine*], that seeks to resolve all issues, including noncommon issues, of liability and damages." *Id.*

Hedging on this statement, however, the *Georgine* court qualified this standard of commonality by stating that it was not holding that "this class fails the commonality requirement because the test of commonality is subsumed by the predominance requirement, which this class cannot conceivably meet." *Id.* The *Georgine* court explained that it was proceeding "cautiously here because establishing a high threshold for commonality might have repercussions for class actions very different from this case...." *Id.* It appears from these statements the Third Circuit was being ever so careful not to raise the threshold requirement of commonality in class actions except in the most extraordinary cases, such as *Georgine.*

In this case, the Court will not impose a higher threshold of commonality than the standard that was articulated in *Baby Neal.* Although this class action case possesses its own unique features, it is not *Georgine.* *Georgine* was a "personal injury damages class action," involving a settlement class, that was national in scope, where class members were being asked to compromise future claims without knowing what those claims might be. Most of these factors are not implicated by the facts in this case, thus the Court will not impose the higher threshold commonality requirement.

Under the *Baby Neal* standard, plaintiffs manifestly satisfy the commonality standard because there are many common questions of law and/or fact. Under *Baby Neal,* plaintiffs merely have to demonstrate that there is one common question of law or fact to satisfy the commonality requirement. Plaintiffs have alleged at least one common question. For example, whether defendants have acted in concert or pursuant to a common design is one common question. Additionally, whether defendants' actions and omissions in the manufacture, promotion and sale of cigarettes to class members have been sufficiently egregious to warrant the imposition of punitive damages is another common question. Thus, the Court finds that the commonality standard is satisfied.[7]

### 3. Typicality

The third requirement, "typicality", focuses upon whether the claims of the class representatives are "typical of the claims ... of the class."[8] The typicality requirement "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Baby Neal,* 43 F.3d at 57.

---

7. Although the threshold requirement of commonality is met, the Court, as discussed below in Part II.C.1., finds that the "test of commonality is subsumed by the predominance requirement," which the putative class in this case "cannot conceivably meet." *See Georgine,* 83 F.3d at 627. This subsumption, however, occurs only as to plaintiff's request for class certification under 23(b)(3). Plaintiffs also seek class certification of their medical monitoring claim under Rule 23(b)(2). There is no subsumption of the commonality requirement under subsection (b)(2) because this subsection does not contain a predominance inquiry.

8. "The concepts of commonality and typicality are broadly defined and tend to merge." *Baby*

*Neal,* 43 F.3d at 56 (citation omitted). Both requirements attempt to "assure that the action can be practically and efficiently maintained and that the interests of the absentees will·be fairly and adequately represented." *Id.* (citing *General Tel. Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)). Despite this similarity, commonality and typicality serve two distinct functions. "'Commonality' like numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff...." *Hassine v. Jeffes,* 846 F.2d 169, 177 n. 4 (3d Cir.1988).

"Typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Id.* (quoting *Hassine,* 846 F.2d at 177).

 "The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." *Georgine,* 83 F.3d at 631 (citing *Baby Neal,* 43 F.3d at 57). A plaintiff's claims are considered typical where, in light of the facts and law applicable to the case, litigation of the named plaintiff's personal claims can reasonably be expected to advance the interests of absent class members. *Scott v. University of Delaware,* 601 F.2d 76, 84 (3d Cir.1979). Additionally, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Grasty v. Amalgamated Clothing & Textile Workers Union,* 828 F.2d 123, 130 (3d Cir.1987); Herbert B. Newberg & Alba Conte, *1 Newberg on Class Actions* § 3.15 (3d ed.1992).

 Plaintiffs argue that the typicality requirement is easily satisfied in this case. Plaintiffs contend that "the named Plaintiffs' claims arise from the same course of conduct that has affected the class, they are members of the class as defined for purposes of certification, and they have requested remedies that will provide probable benefits to the entire class." (Pls.' Mot. Class Certification at 32).

Defendants rejoin that none of the named plaintiffs can satisfy the typicality requirement because typicality requires that the named plaintiffs "must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon,* 457 U.S. at 156, 102 S.Ct. at 2370. Defendants essentially argue that the breadth of plaintiffs' class definition and the individualized nature of plaintiffs' claims preclude any named plaintiff from having claims "typical" of the class as a whole. Defendants state that:

> The putative class embraces a myriad of differently situated plaintiffs, each of whom smoked different products (or different combination of products), in different quantities, during different periods of time. Class members may range from a person who has smoked three packs of cigarettes a day for the last thirty years to a person who has smoked two cigarettes a week for the last twelve months.

(Defs.' Resp. at 57). In advancing this argument, defendants rely heavily on the Third Circuit's articulation of the typicality requirement in the context of products liability and toxic torts suits. *See Georgine,* 83 F.3d at 631–32.

In *Georgine,* the class consisted of all persons exposed to asbestos-containing products. No threshold level of exposure was required for class membership. *Id.* at 619 & n. 13. The named plaintiffs sought recovery on behalf of individuals who had already contracted asbestos-related diseases and individuals exposed to asbestos who had suffered no physical ailments but might, in the future, contract such conditions ("futures"). *Id.* at 619, 626. In reversing the district court's decision to certify the class, the Third Circuit held that differences between class members precluded a finding of typicality:

> [T]his class is a hodgepodge of factually as well as legally different plaintiffs.... [T]hese differences create problematic conflicts of interest among different members of the class. These problems lead us to hold that no set of representatives can be "typical" of this class. Even though the named plaintiffs include a fairly representative mix of futures and injured plaintiffs, the underlying lack of commonality and attendant conflicts necessarily destroy the possibility of typicality.

*Id.* at 632. Defendants argue that, in this case, factual differences among the putative class members make each plaintiff's claim atypical of the claims of other class members.

Defendants set forth the following factual differences in support of their argument. Cigarettes have changed in design and composition over the years. (Myracle Aff. ¶¶ 8–10; Townsend Aff. ¶¶ 6, 15–16; Jones Aff.

¶¶ 2–9). Changes between and among several hundreds of different brands and styles of cigarettes manufactured over the past several decades, (Myracle Aff. ¶¶ 14), differences in how long a plaintiff smoked, the volume smoked and what brand a particular plaintiff smoked and when also preclude finding "any individual typical of the class." Defendants further note that plaintiffs also allege that their claims relate to many different "toxic" and "hazardous substances" of which nicotine is only one. (First Amended Compl. ¶¶ 10, 13). Defendants summarize their argument by explaining that the substantial differences between the members of the putative class—most significantly in the areas of exposure and causation—make it impossible for any set of class representatives to be "typical" of the class as a whole.

Despite defendants' credible argument, the Court finds that defendants fall short of demonstrating that the typicality criterion of Rule 23(a) has not been satisfied. Plaintiffs allege that their claims arise from the same course of conduct undertaken by defendants. Specifically, plaintiffs have alleged that defendants have engaged in a concerted course of conduct whereby defendants have concealed their knowledge of nicotine's addictive properties and have purposefully and deliberately emphasized efforts to addict children and adolescents-resulting in an epidemic pediatric disease. In this process, plaintiffs allege that these consumers were involuntary subject to the cumulative, repetitive assault of the many different carcinogens contained in tobacco smoke. Although plaintiffs' claims may be factually different, plaintiffs have alleged a course of conduct by defendants that has given rise to plaintiffs' claims which are based upon the same legal theories, thus satisfying the typicality requirement of Rule 23(a)(3).

Indeed, the Third Circuit has held that "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of the legal theories." *Baby Neal,* 43 F.3d at 58 (citing *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)). In this case, there is a strong similarity between the legal theories being advanced by the named plaintiffs and the legal theories of the putative class members. Therefore the pronounced factual differences between each member of the putative class do not preclude a finding of typicality due to the fact that there is, at a minimum, "a strong similarity of legal theories."

Although defendants succeed in demonstrating that there exist many individualized questions which arise from the factual differences between the putative class members' individual claims, defendants fail to demonstrate that the "legal theories of the named plaintiffs potentially conflict with those of the absentees...." *See Baby Neal,* 43 F.3d at 57. In other words, the Court concludes that "named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." *See Georgine,* 83 F.3d at 631 (citing *Baby Neal,* 43 F.3d at 57).

### 4. Adequacy of Representation

■■■ Finally, Rule 23(a)(4) requires that plaintiffs must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Third Circuit has consistently relied on two factors:

> (a) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation; and (b) the Plaintiff must not have interests antagonistic to those of the class.

*Weiss,* 745 F.2d at 811 (quoting *Wetzel,* 508 F.2d at 247). Although defendants do not question the adequacy of plaintiffs' counsel, defendants seriously question the ability of named plaintiffs to adequately represent the putative class.

■■■ Pennsylvania law prohibits splitting a single claim into multiple legal actions. *Kessler v. Old Guard Mut. Ins. Co.,* 391 Pa.Super. 175, 182–83, 570 A.2d 569, 573 (1990); *Consolidation Coal Co. v. District 5, United Mine Workers of America,* 336 Pa.Super. 354, 363, 485 A.2d 1118, 1122 (1984). In addition, failure to join in one action all causes of action which arise from the same transaction or occurrence may result in the waiver of the unmade claims. *Hineline v. Stroudsburg Elec. Supply Co., Inc.,* 402 Pa.Super. 178, 181, 586 A.2d 455,

456, *app. denied*, 528 Pa. 630, 598 A.2d 284 (1991). Applying these legal principles, defendants contend that named plaintiffs, with their amendment to the initial complaint, have abandoned many of the legal theories that they brought in their initial complaint. In so doing, defendants argue that named plaintiffs have patently demonstrated themselves to be inadequate class representatives because they risk waiving the damage claims of other class members.

■ In support of their argument defendants look to the case of *Pearl v. Allied Corp.*, 102 F.R.D. 921 (E.D.Pa.1984). In *Pearl*, plaintiffs filed an amended complaint seeking medical monitoring and punitive damages but abandoning claims made in their initial complaint for present personal injury and breach of express warranty. The court found that this willingness to gerrymander claims precluded a finding that the named plaintiffs were fit to represent the class:

> [I]t appears that the plaintiffs' efforts to certify a class by abandoning some of the claims of their fellow class members have rendered then inadequate class representatives.... [C]lass members whose claims would be abandoned by the plaintiffs may find themselves precluded ... from asserting those claims in subsequent actions. For this reason, the plaintiffs cannot properly serve as class representatives.

*Id.* at 923–24. *Accord Feinstein v. Firestone Tire and Rubber Co.*, 535 F.Supp. 595, 606 (S.D.N.Y.1982); *see also Chmieleski v. City Prod. Corp.*, 71 F.R.D. 118, 147–49 (W.D.Mo. 1976). Based on this case, defendants have tentatively demonstrated that named plaintiffs are inadequate representatives of the class. Indeed, named plaintiffs who would intentionally waive or abandon potential claims of absentee plaintiffs have interests antagonistic to those of the class.

■ Before the Court concludes that the named plaintiffs have waived or abandoned any potential claims, the Court must closely exam the facts of this case through the prism of Pennsylvania law to determine whether there was an actual waiver of potential claims. Under Pennsylvania law, a plaintiff is not barred from initiating a subsequent lawsuit unless and until he or she has a compensable injury. *See Manzi v. H.K. Porter Co.*, 402 Pa.Super. 595, 587 A.2d 778 (1991). In *Manzi*, plaintiff had developed pleural thickening, a condition caused by exposure to asbestos, but had not yet sustained any lung cancer. The Superior Court affirmed that his suit for pleural thickening did not preclude a subsequent suit should he develop lung cancer.

Applying this reasoning to the present case, the "monitoring" for diseases cannot logically be deemed to preclude class members from bringing future actions for diseases which class members may subsequently suffer from their exposure to cigarettes. In effect, the current class can be maintained and advanced on the current legal theories, excluding those theories which have been dropped with the amendment, without jeopardizing a class member's right to bring a subsequent action after he or she develops a disease. Theoretically, Pennsylvania law allows these class members to bring subsequent suits to recover for the actual injury of disease, and these lawsuits may be grounded in the legal theories which were dropped from the original complaint in this action. Because Pennsylvania law permits such conduct, the Court rejects defendants' attack on the named plaintiffs' adequacy of representation.

Thus disposing of defendants' challenge to adequacy, the Court finds that plaintiffs have demonstrated that the threshold requisites of Rule 23(a)(1)–(4) have been satisfied. Clearing the Rule 23(a) hurdle, defendants must demonstrate that its putative class satisfies one of the sub-parts of Rule 23(b)

### B. *Rule 23(b)(2)*

Plaintiffs contend that their medical monitoring claim is appropriate for class certification under Rule 23(b)(2).[9] Plaintiffs argue

---

9. Rule 23(b)(2) provides:

> **(b) Class Actions Maintainable**. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> \* \* \* \* \* \*

that because their medical monitoring cause of action sounds in equity, the Court may properly certify it under Fed.R.Civ.P. 23(b)(2). Defendants assert a panoply of reasons as to why this Court cannot permissibly certify plaintiffs' medical monitoring claim under Rule 23(b)(2). The Court addresses the issues raised *seriatim*.

■ As a threshold matter, this Court rejects defendants' argument that "medical monitoring is not a separate cause of action but rather a compensable item of damages available only under very narrow circumstances...." (Defs.' Resp. at 34). Defendants rely on the Pennsylvania Supreme Court's 1996 decision in *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (1996). Defendants explain that although *Simmons* acknowledged *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829 (3d Cir.1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991) (*"Paoli I"*) (a pre-*Simmons* case in which the Third Circuit predicted that Pennsylvania would recognize a separate cause of action for medical monitoring), *Simmons* did not adopt *Paoli I* but rather relied instead upon the Arizona Court of Appeals decision in *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28 (App.1988). In *Burns*, the court described medical monitoring as a compensable item of damages. *Id.* at 33. From *Simmons'* reliance on *Burns*, defendants extrapolate the conclusion that Pennsylvania does not recognize medical monitoring as a distinct cause of action but rather only as a compensable item of damages.

Defendants' argument is contrary to the plain language of *Simmons*. In explaining the nature of medical monitoring, the *Simmons* court stated that " 'injury in a medical monitoring *claim* is the cost of the medical care....' " *Simmons*, 674 A.2d at 240 n. 11 (citation omitted) (emphasis added). *Simmons*, which was decided by Judge Joyner who also sat by designation on the appellate

panel in *Redland Soccer Club, Inc. v. Department of Army of United States*, 55 F.3d 827 (3d Cir.1995), teaches that Pennsylvania law recognizes medical monitoring as a separate and distinct cause of action. *See Simmons*, 674 A.2d at 240; *see also Wagner v. Anzon*, 453 Pa.Super. 619, 631 n. 7, 684 A.2d 570, 575 n. 7 (1996) ("*Simmons* recognized a claim for medical monitoring for plaintiffs"); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 718 (3d Cir.1994) (*"Paoli II"*); *Redland*, 55 F.3d 827.

■ Although the Pennsylvania Supreme Court recognized a cause of action for medical monitoring, the Supreme Court did not describe the elements that comprise the cause of action. *Simmons* however cited the Third Circuit's opinion in *Paoli I*, where the Third Circuit articulated a four-element requirement for the maintenance of a medical monitoring claim. Under *Paoli*, the four elements are:

1. Plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant;

2. As a proximate result of exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease;

3. That increased risk makes periodic examinations reasonably necessary; and

4. Monitoring and testing procedures exists which make the early detection and treatment of the disease possible and beneficial.

*Paoli I*, 916 F.2d at 852.[10] Now that the Court has determined that medical monitoring is a distinct cause of action under Pennsylvania law, the Court turns its attention to whether this cause of action can be certified under Rule 23(b)(2).

■ Certification under Fed.R.Civ.P. 23(b)(2) is appropriate where equitable and injunctive relief is the sole or primary relief

---

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2).

**10.** Defendants argue that the Court must examine other factors, besides the four elements identified in the preceding text, before a successful claim for medical monitoring can be established. The Court will discuss these "other factors" in Part II.C.1. of this opinion.

sought and "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *See Rules Advisory Committee Notes to 1966 Amendments to Rule 23*, 39 F.R.D. 69, 102 (1966); *School Asbestos Litigation*, 789 F.2d at 1008. Rule 23(b)(2) may not be invoked in a case requiring "significant individual liability or defense issues which would require separate hearings for each class member in order to establish defendants' liability." *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 627 (E.D.Pa.1976). As the *Santiago* court explained, "the court should be more hesitant in accepting a (b)(2) suit which contains significant individual issues than it would under subsection (b)(3)," because Rule 23(b)(2) actions do not permit opt outs. *Id.* at 628. With these principles in mind, the Court determines whether plaintiffs' medical monitoring claim can be certified.

Defendants argue that numerous courts, including the Third Circuit, have refused to view a medical monitoring claim as a request for injunctive relief and have therefore denied 23(b)(2) certification. Defendants contend that the Third Circuit has explicitly held that such a request for medical monitoring is a request for money damages. *See Jaffee v. United States*, 592 F.2d 712 (3d Cir.1979). In *Jaffee*, plaintiff sought an injunction ordering the defendants to provide medical monitoring; the Third Circuit rejected the argument:

> We agree that the request for prompt medical examinations and all medical care and necessary treatment, in fact, is a claim for money damages. A plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money.... [Plaintiff] requests a traditional form of damages in tort—compensation for medical expenses to be incurred in the future.

*Id.* at 715. *Accord School Asbestos Litigation*, 789 F.2d at 1008 (affirming denial of (b)(2) class certification of claims for "mandatory injunctive relief," including claim for medical monitoring services, found by district court to be "essentially for damages").

Defendants note that other courts in this Circuit have also refused to certify medical monitoring claims under Rule 23(b)(2). *See, e.g., Hurt v. Philadelphia Hous. Auth.*, 151 F.R.D. 555, 561 (E.D.Pa.1993); *Abbent v. Eastman Kodak*, No. 90–3436, slip op. (D.N.J. Aug. 28, 1992); *Brown v. SEPTA*, 1987 WL 9273 at *12 (E.D.Pa. Apr. 9, 1987); *Villari v. Terminix Int'l Inc.*, 663 F.Supp. 727, 735 (E.D.Pa.1987); *Linkous v. Medtronic, Inc.*, 1985 WL 2602, at *8 (E.D.Pa. Sept.4, 1985); *In re Three Mile Island Litigation*, 87 F.R.D. 433, 442 (M.D.Pa.1980); *Greenberg v. McCabe*, 453 F.Supp. 765, 773 (E.D.Pa. 1978).

In the outside chance that these cases do not sufficiently persuade this Court as to the correctness of its position, defendants point the Court's attention to cases from both the Pennsylvania state courts and federal and state courts of other states. *See, e.g., Simmons*, 674 A.2d at 239; *In re Kreamer Municipal Well Litigation*, No. 336–1985 (Synder County Court of Common Pleas, Jan. 15, 1990), slip op. at 59 ("issues pertaining to damages ... shall be limited to institution of a medical monitoring program"); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1535 (10th Cir. 1992); *Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th Cir.1991); *Thomas v. FAG Bearings Corp., Inc.*, 846 F.Supp. 1400 (W.D.Mo.1994); *Cain v. Armstrong World Indus.*, 785 F.Supp. 1448, 1451–52 (S.D.Ala. 1992); *Gerardi v. Nuclear Util. Serv.*, 149 Misc.2d 657, 566 N.Y.S.2d 1002, 1004 (N.Y.Sup.1991).

From this plethora of cases, defendants broadly conclude that courts have refused to view a medical monitoring claim as a request for injunctive relief. Defendants appear to argue that a request for a medical monitoring fund is inherently a request for monetary damages. And as such, putative class plaintiffs could never request certification of a medical monitoring fund under Rule 23(b)(2).

Contrary to defendants' position, plaintiffs take the sanguine view that the creation of a court-supervised medical monitoring fund is properly within a court's equitable powers. (Pls.' Reply at 44). Plaintiffs contend that the Pennsylvania Supreme Court in *Simmons* implicitly recognized that the awarding

of a medical monitoring fund may be appropriate injunctive relief. Plaintiffs contend that the *Simmons* court adopted the rationale of *Burns,* where the Arizona Court of Appeals held that the creation of a medical monitoring fund "to administer medical surveillance payments ... is a highly appropriate exercise of the Court's equitable powers." *Burns,* 752 P.2d at 32 (citation omitted).

Plaintiffs maintain that the Pennsylvania Supreme Court's implicit endorsement of *Burns* is consistent with many other state and federal court decisions, wherein these courts have concluded that if a plaintiff requests that a court-supervised medical monitoring fund be established, a Rule 23(b)(2) class action is appropriate. *See, e.g., Shiffka v. Spencer Metal Processing Co.,* No. 32–E–1987 (Luzerne County Court of Common Pleas, Jan. 12, 1990); *Yslava v. Hughes Aircraft Co.,* 845 F.Supp. 705 (D.Ariz.1993); *Day v. NLO, Inc.,* 144 F.R.D. 330 (S.D.Ohio 1992); *Cook v. Rockwell Int'l Corp.,* 778 F.Supp. 512 (D.Colo.1991); *Barth v. Firestone Tire & Rubber Co.,* 661 F.Supp. 193 (N.D.Cal.1987). Relying on these cases, plaintiffs conclude that courts may certify a medical monitoring claim under Rule 23(b)(2) when plaintiff primarily seeks a court-supervised medical monitoring program; plaintiffs state that courts can grant such relief because a court-supervised medical monitoring program is a request for injunctive relief.

The Court finds that it may properly certify a medical monitoring claim under Rule 23(b)(2) when the plaintiffs seek such specific relief which can be properly characterized as invoking the court's equitable powers. *See Day,* 144 F.R.D. at 336; *see also Fried v. Sungard Recovery Serv., Inc.,* 925 F.Supp. 372 (E.D.Pa.1996). In reaching this decision, the Court perforce rejects defendants' argument that a medical monitoring claim can never be characterized as injunctive.

The dispositive factor that must be assessed to determine whether a medical monitoring claim can be certified as a Rule 23(b)(2) class is-what type of relief do plaintiffs actually seek. If plaintiffs seek relief that is a disguised request for compensatory damages, then the medical monitoring claim can only be characterized as a claim for monetary damages. In contrast, if plaintiffs seek the establishment of a court-supervised medical monitoring program through which the class members will receive periodic examinations, then plaintiffs' medical monitoring claim can be properly characterized as claim seeking injunctive relief.

In *Day,* Judge Spiegel cogently articulates the fine distinction between a medical monitoring claim that seeks monetary relief in the form of compensatory damages and a medical monitoring claim that seeks injunctive relief in the form of a court-supervised medical monitoring program. Judge Spiegel explains:

> Relief in the form of medical monitoring may be by a number of means. First, a court may simply order a defendant to pay a plaintiff a certain sum of money. The plaintiff may or may not choose to use that money to have his medical condition monitored. Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice. Neither of these forms of relief constitute injunctive relief as required by Rule 23(b)(2).
>
> However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced is utilized for group studies. In this situation, a defendant, of course, would finance the program as well as being required by the Court to address issues as they develop during the program administration. *Under these circumstances, the relief constitutes injunctive relief as required by Rule 23(b)(2).*

*Day,* 144 F.R.D. at 335—36;[11] *see also Fried,* 925 F.Supp. at 374 (implying that

---

**11.** Defendants suggest that Judge Spiegel has changed his view about medical monitoring in light of his recent opinion in *In re Telectronics Pacing Systems, Inc.,* 168 F.R.D. 203 (S.D.Ohio 1996). In *Telectronics,* Judge Spiegel noted in dicta that since *Day* was decided, several states have permitted recovery of damages for medical monitoring as part of the relief. *Id.* at 219 n. 17.

under medical monitoring case law, a creation of a medical monitoring program would be equitable in nature). Based on Judge Spiegel's insightful distinction, it is apparent that relief requested under a medical monitoring claim can be either injunctive or equitable in nature.

■ To determine whether the named plaintiffs in this case seek equitable relief under their medical monitoring claim, plaintiffs' specific request for relief under this claim must be closely scrutinized. Plaintiffs seek the establishment of a court-supervised program through which the class members would undergo periodic medical examinations in order to promote the early detection of diseases caused by smoking. This portion of plaintiffs' request is the paradigmatic request for injunctive relief under a medical monitoring claim.

Nevertheless, plaintiffs' request for relief under their medical monitoring claim extends far beyond just these periodic examinations. Plaintiffs seek not only a fund for the detection of disease but also a fund for its treatment. (Pls.' Interrog. Resp. No. 36; First Amended Complaint ¶ 23). This request for treatment drastically alters the nature of the relief requested by plaintiffs under the medical monitoring claim. In this regard, plaintiffs, claim is in all respects identical to a traditional damage claim for personal injury. The only difference is that plaintiffs seek to filter payment for medical treatment through an intermediary. *Jaffee* is clear on this point. Plaintiffs cannot transform a legal claim into an equitable one merely by using a fund as a repository for money damages. *Jaffee*, 592 F.2d at 715.

Compounding their problems with respect to the monetary nature of the relief requested, plaintiffs also seek to have the Court establish smoking cessation programs in which the class members would be permitted to enroll. Plaintiffs partially claim that they have been injured by their addiction to defendants' products which causes them to be involuntarily exposed to numerous "hazard-

ous substances" and places them at an increased risk of developing the diseases caused by smoking. To overcome this addiction, and thus reduce their chances of contracting smoking-related diseases, plaintiffs specifically request to be enrolled in smoking cessation programs as treatment for their addiction. These smoking cessation programs are also just another form of treatment, and as such, it is merely a disguised request for future damages. Plaintiffs cannot transform a legal claim into an equitable one merely by using a fund as a conduit for money damages.

It is evident that the substantial majority of relief requested is monetary in nature. Plaintiffs request for actual medical monitoring examinations is but a small portion of the relief requested. Indeed, at the class certification hearing, plaintiffs' counsel stated that the yearly medical examinations would cost approximately $2,000 a year per class member. While this sum is not insignificant, it pales in comparison to the amount of monies that would have to be paid out by defendants to treat the addiction and diseases. Plaintiffs' medical monitoring claim is merely a thinly disguised claim for future damages. As such, plaintiffs' medical monitoring claim cannot be certified under Rule 23(b)(2).

■ Additionally, plaintiffs' medical monitoring claim cannot be certified under Rule 23(b)(2) because the overwhelming majority of relief sought by plaintiffs in their entire complaint is monetary in nature. The advisory committee notes accompanying Rule 23(b)(2) state that this rule "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *School Asbestos Litigation*, 789 F.2d at 1008 (citation omitted). In this regard, courts have refused to certify a(b)(2) class action "where the 'realities of the litigation' demonstrate that suit has been brought primarily for money damages...." *Christiana Mortgage v. Delaware Mortgage Bankers Ass'n*, 136 F.R.D. 372, 381–82 (D.Del.

---

In Pennsylvania, however, medical monitoring is an independent cause of action, not a compensable item of damages. Thus, Judge Spiegel's dicta does not call into question the continued validity

of *Day* in those jurisdictions, including Pennsylvania, where medical monitoring is an independent cause of action.

1991) (citing *School Asbestos Litigation*, 789 F.2d at 1008).

Although plaintiffs' request for periodic medical examinations pursuant to a court-supervised program could be properly viewed as "injunctive" relief, the majority of relief sought by plaintiffs is compensatory. As plaintiffs' counsel made clear at the class certification hearing, the largest part of plaintiffs' claim is not their request for monitoring, but the request for compensatory relief-money for having purchased cigarettes (estimated at up to $350,000 per smoker) and punitive damages (conservatively estimated at a one-to-one ratio as being up to $350,000). (Transcript at 40, 43). These numbers categorically demonstrate that the majority of relief sought by plaintiffs is monetary in nature. As such, a class cannot be properly certified under Rule 23(b)(2) but must satisfy the requirements of Rule 23(b)(3).

### C. Rule 23(b)(3)

Rule 23(b)(3) provides:

(b) **Class actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to the other available methods for fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation and the claims in the particular forum; (D) the difficulties likely to be

encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Plaintiffs submit that all of their claims can be properly certified under Rule 23(b)(3). Defendants vigorously oppose such certification, arguing that plaintiffs cannot satisfy the predominance or superiority prongs of 23(b)(3).[12]

#### 1. Predominance

■ Under Rule 23(b)(3), a court must determine whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members...." Fed.R.Civ.P. 23(b)(3). In order for the commons issues to "predominate," common issues must constitute a significant part of the individual cases. *See Jenkins*, 782 F.2d 468.

■ A court must satisfy itself that common issues predominate over individual issues because such a finding assures that the purposes of Rule 23(b)(3) are furthered. "Subdivision 23(b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Rules Advisory Committee Notes to 1966 Amendments to Rule 23*, 39 F.R.D. 69, 102 (1966). It is only when predominance exists that a court can be sure that economies can be achieved by means of the class action. *Id.*

■ After a thorough review of both the common and individual issues that are implicated by the facts of this case, the Court concludes that the common issues do not predominate over the individual issues. Plaintiffs contend that there are overriding common issues about defendants' behavior: specifically, whether the tobacco companies have, over the past decades, engaged in

**12.** Plaintiffs point to both *Broin v. Philip Morris Companies, Inc.*, 641 So.2d 888 (Fla.Ct.App.3d Dist.1994), *rev. denied*, 654 So.2d 919 (Fla.1995) and *R.J. Reynolds Tobacco Co. v.Engle*, 672 So.2d 39 (Fla.Ct.App.3d Dist.1996), *rev. denied*, 682 So.2d 1100 (Fla.1996), as persuasive authority for the certification of a class in this case under

Rule 23(b)(3). The Court finds that these cases offer no real assistance to its determination of Rule 23(b)(3) certification. First, the cases are factually and legally distinguishable from this case. Second, both opinions are devoid of a thorough analysis of the requirements which must be satisfied before a class is certified.

intentional, reckless conduct to control and manipulate nicotine levels, in order deliberately to addict smokers, particularly young people, and to intentionally, recklessly, or negligently expose people to hazardous substances.

(Pls.' Mot. Class Certification at 19). Plaintiffs argue that the common issues about the tobacco companies' historic and present conduct predominate over any individual issues, thus making this action "classically appropriate for class certification." While defendants' conduct raises many common issues, the Court cannot agree with plaintiffs' assessment that this case is "classically appropriate for class certification."

Upon closer examination of the issues raised herein, it becomes evident that the individual issues raised not only predominate over the common issues but overwhelm the common issues. A class action in this case would not "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." With this stated, the Court will specifically explain how the individual issues preclude any possible 23(b)(3) certification.

 Although the Supreme Court has warned that a court considering class certification may not conduct a preliminary inquiry into the merits of a suit, *see Eisen,* 417 U.S. at 177–78, 94 S.Ct. at 2152–53, a court may look beyond the confines of the pleading to determine whether the requirements of Rule 23 have been satisfied. *Castano,* 84 F.3d at 744.[13] "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable sub-

stantive law in order to make a meaningful determination of the certification issues." *Id.* (*Manual for Complex Litigation* § 30.11). An examination of the claims, defenses, relevant facts and applicable substantive law leads to the inescapable conclusion that individual issues pervade this entire action.

Plaintiffs' request for class certification under Rule 23(b)(3) is contrary to the weight of authority in mass tort cases. Both the *Georgine* and *Castano* courts, which were mass tort cases, refused to certify classes under Rule 23(b)(3). In reasoning fully applicable to this case, Judge Becker only recently stated, it is "difficult to fathom" how common issues could predominate in any mass tort products case:

> [T]he class members' claims vary widely in character. Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods ... Each has a different history of cigarette smoking, a factor that complicates the causation inquiry.
>
> \* \* \*
>
> These factual differences translate into significant legal differences. Difference in the amount of exposure and injury lead to disparate applications of legal rules, including matters of causation, comparative fault, and the types of damages available to each plaintiff.

*Georgine,* 83 F.3d at 626–27. The Fifth Circuit echoed those concerns when it rejected certification of claims virtually identical to those raised in this case. *Castano,* 84 F.3d at 743.[14]

---

13. *See also Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372 ("Sometimes the issues are plain enough from the pleading ... and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (explaining that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action' ").

14. *See also In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293 (7th Cir.1995) (decertifying product liability class action); *In re American Medical*

*Sys., Inc.,* 75 F.3d 1069, 1084 (6th Cir.1996) (reversing certification of products liability class action against makers of penile implants—"economies of scale achieved by class treatment are more than offset by the individualization of numerous issues relevant only to a particular plaintiff"); *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988) ("In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriate-

Additionally, the advisory committee notes to Rule 23(b)(3) instruct us that:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

*Id.* at 745 n. 19 (citing *Rules Advisory Committee Notes to 1966 Amendments to Rule 23*, 39 F.R.D. at 103).[15] The reasons that underlie this overwhelming weight of authority against certification of mass tort cases are equally applicable here.

Plaintiffs' negligence and strict liability theories raise numerous individual issues that predominate over any class-wide issues. The elements of these particular claims and attendant affirmative defenses raise innumerable individual issues which overwhelm the class–wide issues.

Plaintiffs' entire action centers around addiction and whether the plaintiffs are addicted. Plaintiffs allege that defendants have consistently and publicly denied that cigarettes are hazardous and addictive, while aware that the results of their own internal research demonstrate the addictive qualities of nicotine, and have accordingly manipulated that level of nicotine in their cigarettes with the intent and for the commercial purpose of creating and sustaining plaintiffs' addiction to their product. Plaintiffs continue by claiming that "these consumers were *involuntarily* subject to the cumulative, repetitive assault of the many different carcinogens contained in tobacco smoke: for Defendants, a foreseeable, and foreseen consequence of addiction that De-

fendants, in the name of profit, deliberately inflicted upon the class." (Pls.' Reply Br. at 8–9) (emphasis added).

As an essential part of their claim, plaintiffs allege that their exposure to many different carcinogens was "involuntary" because they were addicted. In other words, addiction has robbed plaintiffs of the voluntary choice to decide whether they would expose themselves to the carcinogens in tobacco smoke.

Additionally, plaintiffs highlight the importance of addiction as part of their theory when they argue that the affirmative defense of assumption of risk is not available to defendants. Plaintiffs contend that defendants should be barred from relying on their "personal choice" argument because information has allegedly arisen that indicates that tobacco companies have knowingly used the "addictive power of nicotine" to "hook" young smokers to become "life-long" smokers. (Defs.' Post–Hr'g Mem. at 9). Plaintiffs submit that these smokers were robbed of "free choice" due to addiction. Thus, plaintiffs' theory of liability relies heavily on their being able to prove that the class members are addicted. The question which is thus posited at this point is not whether plaintiffs can prove addiction, but rather how they will prove addiction, *i.e.*, can they prove it on a class-wide basis as opposed to individual inquiries.

Plaintiffs' own expert Dr. Burns recognizes that the assessment of addiction is an inherently individual inquiry. (Burns Dep. at 64, 268)[16] Based on this statement, defendants argue that class certification under these circumstances would require a mini-hearing on the merits of each individual's case to determine injury. *See Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D.Pa.1995). Importantly, the Court finds that nowhere in

---

ness of a class action for resolving the controversy").

**15.** Although plaintiffs have argued that Professor Charles Allen Wright, a member of the Advisory Committee, has now repudiated this passage, he has opined that certification of what purports to be a class action on behalf of everyone who "has ever been 'addicted' to nicotine" would be a "Frankenstein's monster." *Castano*, 84 F.3d at

745 n. 19 (citing Letter of Dec. 22, 1994, to N. Reid Neureiter).

**16.** Dr. Hughes, plaintiffs' expert in the *Castano* litigation, also testified in *Castano* that addiction is an individual inquiry that involves an analysis of "the person, and the circumstances in the person's life." (Hughes Dep. at 87–88, 201–203, 209–212, 316–317).

plaintiffs' voluminous submissions do they actually refute that addiction is an inherently individual inquiry. Instead, plaintiffs offer a solution to this massive problem of proving addiction on an individual basis. Plaintiffs propose that once the general issue as to whether cigarettes can cause addiction [17] is resolved, the issue as to whether each and every class member is addicted can be resolved by having them answer a questionnaire, consisting of six simple questions. Defendants rejoin that this questionnaire cannot by itself determine whether a person is nicotine dependent.[18]

The Court finds that even if the questionnaire was used to determine nicotine dependence, defendants would be permitted to cross-examine each and every class member as to their alleged dependence. Plaintiffs admittedly acknowledge that the plan they propose would be, at most, a *prima facie* indication of addiction. Plaintiffs' own experts concede that addiction is necessarily an individual inquiry. To refute plaintiffs' *prima facie* case, defendants would be permitted to cross-examine each individual about his specific choices, decisions and behavior, and defendants would be entitled to offer expert testimony about each person's specific circumstances and diagnosis. Based on this one individual issue, class certification under Rule 23(b)(3) is not appropriate because the cross-examination of each class member in a trial would be impossible.[19]

To succeed on their products liability and negligence claims, plaintiffs will also have to prove "causation," which the Court finds is not capable of determination on a class-wide basis in this case. Resolution of the "general causation" question of whether cigarettes are capable of being addictive "is not common under Rule 23(a)(2)." *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 677 (N.D.Ohio 1995). Unless it is proven that cigarettes always cause or never cause addiction, "the resolution of the general causation question accomplishes nothing for any individual plaintiff." *Id.; see also In re "Agent Orange" Product Liability Litigation*, 818 F.2d 145, 164 (2d Cir.1987) (the "relevant question is not whether Agent Orange has the capacity to cause harm," but rather the "highly individualistic" question of whether "it did cause harm and to whom").

As explained previously, plaintiffs do not actually refute the proposition that a finding of addiction entails an individualistic inquiry; instead, they suggest that this individualistic inquiry can be proven by a questionnaire, consisting of six questions. The use, however, of this questionnaire will not obviate the need for cross-examination by defendants as demonstrated above. If plaintiffs are unable to prove that cigarettes always cause addiction (a contention that plaintiffs do not advance), the Court is faced with the impossible reality of trying a case in which one million persons would have to be cross-examined as to causation.

■ Plaintiffs cannot satisfy the "causation" element of these claims by proving that all cigarettes can potentially cause the user to become addicted.[20] This is a general causation issue. The resolution of this "general

---

**17.** The Court will use the terms "addiction" and "nicotine dependence" interchangeably.

**18.** The questionnaire is called the Fagerstrom Assessment for Nicotine Dependence. Plaintiffs submit that a reliable determination as to whether a potential class member is nicotine dependent can be made if the potential class member scores within a certain range on this test. In contrast to this simple nicotine dependence test, defendants cite to the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.) ("DSM–IV"). DSM–IV contains a section on "substance dependence", which requires individual inquiries and clinical assessments. A thorough reading of DSM–IV's section on substance dependence would lead a neutral observer to believe that whether a person has a substance dependence can only be determined by an individual inquiry.

**19.** If the examination necessary for the jury to decide each of these individual issues took only one hour per person, and if this class is composed of one million people, then the "trial" of this case would take (with testimony being heard 8 hours a day, 50 weeks per year) approximately 250 years.

**20.** In their papers, plaintiffs argue that they will produce experts who will testify that all cigarettes contain nicotine in sufficient quantities to cause addiction/nicotine dependence. Importantly, plaintiffs do not contend that cigarettes will cause addiction/nicotine dependence to each and every individual who smokes.

causation question" would accomplish nothing for any of the individual plaintiffs. *See Kurczi,* 160 F.R.D. at 677. Indeed, the jury would still be required to determine for each class member whether he or she is addicted to cigarettes, and, if so, whether defendants (and which defendant) caused that addiction. With respect to causation, the Court finds that this issue is highly individualized and does not lend itself to Rule 23(b)(2) certification.[21]

To establish their strict products liability claim, plaintiffs will be required to prove a defect in defendants, products. This inquiry is also highly individualized. Defendants manufactured hundreds of different types of cigarettes over the years and have even made changes within each brand. In their First Amended Complaint, plaintiffs allege that defendants' cigarettes contain numerous "hazardous substances," and that defendants have "intentionally manipulated" the levels of nicotine and "other toxic substances." (First Amended Compl. ¶¶ 10, 13). The different types of unspecified defects—which may be present in some cigarettes but not in others—make proof of a defect a non–common issue. As a result, each class member will have to establish that the type of cigarettes he or she smoked contained a defect at the time he or she smoked them. *See In re American Medical Systems,* 75 F.3d at 1081 (commonality not established where the plaintiffs' "claims of strict liability ... will differ upon the model and the year it was issued"). The need to prove a defect in defendants' products raises another individual issue.

Plaintiffs claim that they can prove a common defect on a class-wide basis for all of defendants' products. Plaintiffs argue that all of defendants' products are inherently defective because they contain sufficient levels of nicotine to cause addiction and other hazardous substances. Thus, plaintiffs will attempt to establish a common defect by showing that this combination exists in all of the cigarettes sold by defendants. Nonetheless, the possibility that plaintiffs' common defect theory will fail and that the class will be splintered into various subclasses—creating manageability concerns—"weighs against a finding of predominance of common issues." *Harding v. Tambrands,* 165 F.R.D. 623, 630 (D.Kan.1996) (refusing to certify strict liability class where it is possible that the plaintiffs' common defect theory could fail).

With respect to plaintiffs' medical monitoring claim, the Court also finds that individual issues predominate over common issues.[22] In the *Paoli II* decision, the Third Circuit added an inherently individual factor: "whether a reasonable physician would prescribe for [the plaintiff] a monitoring regime different than the one that would have been prescribed in the absence of that particular exposure." *Paoli II,* 35 F.3d at 788 n. 53. This factor alone would require an individual, plaintiff–by–plaintiff comparison of the medical monitoring program allegedly warranted by smoking with the monitoring program required if the plaintiff had not smoked:

> [A] plaintiff must prove that by reason of exposure to the toxic substance caused by the defendant's negligence, a reasonable physician would prescribe for her or him a monitoring regime different than the one that would have been prescribed in the absence of that particular exposure. This

---

21. In addition, the Court also concludes that the use of questionnaires to establish the elements of causation and injury—without cross-examination or rebuttal evidence—would violate defendants' due process rights. *See In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir.1990) (procedure whereby claims of individual class members are not adjudicated in individual jury trials implicates defendants' right to due process); *In re Masonite Corp. Hardboard Siding Prod. Liab. Litig.,* 170 F.R.D. 417, 425 (E.D.La.1997) (defendants "cannot receive a fair trial without a process which permits a thorough and discrete presentation of [their] defenses").

22. Defendants argue that each class member would have to prove "a demonstrable physical consequence" to be entitled to medical monitoring. (Defs.' Resp. at 34–35). Plaintiffs rejoin that Pennsylvania law does not require a plaintiff to show "a demonstrable physical consequence." Because the Court finds that plaintiffs' medical monitoring claim raises a host of innumerable individual questions without examining whether a plaintiff need show "a demonstrable physical consequence," the Court reserves ruling as to whether this element is part of a medical monitoring claim.

is because under this cause of action, a plaintiff may recover only if the defendant's wrongful acts increased the plaintiff's incremental risk of incurring the harm produced by the toxic substance enough to warrant a change in the medical monitoring that otherwise would be prescribed for that plaintiff.

*Paoli II*, 35 F.3d at 788 (quoting *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 980 (Utah 1993)).

For class members with a minimal smoking history, the level of risk may be outweighed by the burdens and costs of monitoring procedures. Plaintiffs' expert, Dr. Burns, acknowledged that the type of monitoring that would be appropriate would require individual analysis of factors such as the amount and duration of smoking. (Burns Dep. at 113, 118–120). Medical necessity thus widely fluctuates among class members. It appears that these issues cannot be resolved on a class–wide basis.

The diseases for which plaintiffs seek monitoring and treatment are multifactorial diseases with a wide variety of risk factors in addition to smoking and are seen in many individuals who have never smoked. These multiple risk factors include occupational or environmental exposure to asbestos, toxic chemicals or radiation, diet, alcohol consumption, heredity and past medical history. For example, plaintiff Barnes has hypertension, high cholesterol, diabetes and an extensive family history of heart disease. The fact that he smokes would not require any additional monitoring for heart disease not already warranted by the multiple, significant risk factors for heart disease he already has.[23] Therefore, the review of each individual's medical and family history and exposure to other risk factors that *Paoli* requires is an obviously individual inquiry. Plaintiffs offer no suggestion as to how defendants would be able to inquire into each and every plaintiffs' past medical and family history on a class–wide basis.

In addition, to obtain medical monitoring damages, plaintiffs would have to show that the increased risk makes periodic medical examinations "reasonably necessary." *Simmons*, 674 A.2d at 239; *Paoli I*, 916 F.2d at 852. Again, this determination varies from class member to class member depending upon many of the same factors described above.

Finally, even if early detection procedures do exist, the plaintiff must still prove that such procedures are appropriate in his individual case. " '[I]f a reasonable physician would not prescribe [such procedures] for a particular plaintiff because the benefits of the monitoring would be outweighed by the costs, which may include, among other things, the burdensome frequency of the monitoring procedure, its excessive price, or its risk of harm to the patient, then recovery would not be allowed.' " *Paoli II*, 35 F.3d at 788 (quoting *Hansen*, 858 P.2d at 980). In this case, the appropriateness of screening procedures would vary from plaintiff to plaintiff. For some plaintiffs, because of the health risks or excessive costs involved with the particular procedure, the physician would not recommend the medical monitoring procedure. Consequently, this issue is highly individualized and militates against Rule 23(b)(3) certification.

■ The facts and claims of this case implicate a number of affirmative defenses, all of which raise individual issues that preclude a Rule 23(b)(3) certification. The Third Circuit noted in *Georgine* :

> [T]he alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of risk, contributory negligence and the statute of limitations) may depend on facts peculiar to each plaintiff's case.

*Georgine*, 83 F.3d at 628. As mandated by *Georgine*, in making a class certification decision, a district court must examine whether the validity of an affirmative defense depends on "facts peculiar to each plaintiff's case." If a jury would have to look at facts peculiar to

---

23. Dr. Burns concurs with this point: for individuals who already have significant risk factors for diseases that warrant medical monitoring, smoking would not require additional diagnostic tests. (Burns Dep. at 178–81, 240). Dr. Burns states that the "evaluation and screening would stay the same, and the advice [to quit smoking] would change." *Id.* As stated above, advice to quit smoking is not "monitoring," but treatment.

each plaintiff's case when assessing the affirmative defenses, an inherently individual inquiry is required. This individual inquiry most definitely militates against Rule 23(b)(3) certification.

■ In this case, defendants raise numerous affirmative defenses. Under Pennsylvania law, assumption of risk has been found to be a viable defense against strict products liability claims. *See Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1054–55 (3d Cir.1997) (citing *McCown v. International Harvester Co.*, 463 Pa. 13, 15, 342 A.2d 381, 382 (1975)). To prevail on an assumption of risk theory, a defendant must show that the plaintiff knowingly and voluntarily proceeded to use the product or encounter a known danger. *Id.* Assumption of risk is an inherently individual question, turning as it does upon the subjective knowledge and behavior of individual plaintiffs. *Childers v. Power Line Equip. Rentals, Inc.*, 452 Pa.Super. 94, 107, 681 A.2d 201, 208 (1996). Under these principles, each class member's knowledge about the allegedly "addictive" or injurious nature of cigarettes and their decision to begin or continue to smoke in the face of that knowledge is therefore relevant to a determination of assumption of risk.

Additionally, the class member's knowledge would also be relevant to a determination of comparative fault, which is a defense to the negligence claims. 42 Pa. Cons.Stat. Ann. § 7102. The Court could not possibly bifurcate the issue of defendants' negligence and plaintiffs' comparative negligence. As the Court in *Castano* noted, the Seventh Amendment compels that the same jury that hears the evidence of defendants' alleged negligence also hear the comparative negligence evidence with regard to each and every class member. *See Castano*, 84 F.3d at 750–51; *see also Rhone–Poulenc*, 51 F.3d at 1303. Thus, the comparative negligence analysis raises such individual issues of immense proportions that Rule 23(b)(3) certification is obviously inappropriate.

■ Defendants also raise a statute of limitations defense, which is not a common issue. Plaintiff's claims are subject to Pennsylvania's two year statute of limitations. *See* 42 Pa. Cons.Stat. Ann. § 5524. Under the discovery rule, the cause of action accrues, and the statute of limitations begins to run, when the plaintiff knows, or reasonably should know, that he has been injured. *Cathcart v. Keene Indus. Insulation*, 324 Pa.Super. 123, 135–36, 471 A.2d 493, 500 (1984). Once a plaintiff discovers the injury, he is charged with a duty to exercise diligence in investigating the claim. Pennsylvania courts have not hesitated to bar claims under the discovery rule where parties have not exercised reasonable diligence in ascertaining the cause of injury. *Cochran v. GAF Corp.*, 542 Pa. 210, 216, 666 A.2d 245, 248–49 (1995). Here, too, plaintiffs' testimony underscores the individual testimony that would be required at a trial.

Defendants also raise the affirmative defense of "consent" to plaintiffs' claim of intentional exposure to a hazardous substance.[24] The defense of consent is very similar to the defense of assumption of risk. W. Page Keeton, *Prosser and Keeton on Torts* 112 (4th ed.1984). Thus this defense would necessarily require an examination of the facts peculiar to each and every plaintiff; a highly individual issue which militates against certification under Rule 23(b)(3).

Plaintiffs, in response to defendants' "affirmative defenses" argument, set forth two arguments as to why these affirmative defenses do not necessarily lead to the predominance of individual issues. First, plaintiffs suggest that the jury will determine whether the named plaintiffs' claims are barred by affirmative defenses and that those results will bind the remainder of the class "as permitted by law." (Interrog.Resp. No. 42). Such a procedure raises serious fairness and due process concerns for plaintiffs and defendants alike. Absent class members would be greatly prejudiced by a process whereby

---

24. Defendants argue that Pennsylvania does not recognize an independent cause of action for "intentional exposure to a hazardous substance" in a products liability case. (Defs.' Supplemental Br. at 10). Plaintiffs contend that Pennsylvania does recognize such an action. The Court reserves decision on this issue because it is not necessary for the disposition of this instant motion.

their claims could be barred because the class representatives were found to have been contributorily negligent or to have assumed a known risk. The Court finds that this proposal is not a practicable or legitimate solution.

Plaintiffs main argument however is that defendants should be barred as a matter of law from asserting these affirmative defenses. Plaintiffs argue that defendants, due to the facts and circumstances of this case, should be barred from raising the defenses of statute of limitations, consent or assumption of risk. Whether defendants should be barred from raising these defenses necessarily requires a fact–intensive analysis by the Court.

For example, plaintiffs argue that defendants cannot rely on assumption of risk because all of the defendants have denied that cigarettes cause addiction and are carcinogenic. As such, plaintiffs argue that they cannot "assume risks" that the cigarette industry has continually denied exist. Defendants, of course, oppose this contention by plaintiffs. The Court however cannot properly dispose of this issue at the present time because it does not have a full evidentiary record before it. Indeed, these issues are usually raised by way of summary judgment after the parties have completed discovery. A ruling at this juncture in the litigation would be based on an incomplete record and would necessarily prejudice the parties. Thus, the Court refrains from making such a determination.

Moreover, a ruling as to whether an affirmative defense is valid or not does not necessarily advance plaintiffs' position with respect to predominance. For example, the Court may decide that defendants have produced sufficient evidence with respect to its affirmative defenses which would necessitate sending this issue to the jury. Under this scenario, it is obvious that defendants would be permitted to examine each and every class member as to the issues surrounding its affirmative defenses. And even if the Court ruled that defendants were barred from raising one or all of its affirmative defenses, there are numerous remaining individual issues which predominate over the common issues.

In sum, the Court finds that the individual issues implicated by the facts and circumstances of this case predominate over the common issues. Thus the putative class fails the predominance prong of Rule 23(b)(3).

## 2. Superiority

Rule 23(b)(3) provides for certification of a class if the court finds that a class action is the superior method to other available methods for a fair and efficient adjudication of the case. Fed.R.Civ.P. 23(b)(3). In making this superiority determination, the Court should consider the four criteria of Rule 23(b)(3) which address fairness and efficiency.

In addition, a finding of superiority requires:

> (1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method. The interests that should be taken into account include those of the judicial system, the putative class, the instant plaintiffs and defendant and their attorneys, and the general public.

*Lake v. First Nationwide Bank,* 156 F.R.D. 615, 625 (E.D.Pa.1994) (citations omitted). As the Third Circuit has recently explained, Rule 23(b)(3) asks us to balance, in terms of fairness and efficiency, the merits of a class action against those of "alternative available methods" of adjudication. *Georgine,* 83 F.3d at 632. Because this class suffers major problems in both efficiency and fairness, the Court finds that plaintiffs' putative class independently fails the superiority requirement of Rule 23(b)(3).

As in *Georgine,* in terms of efficiency, a class of this "magnitude and complexity" could not be tried. *See id.* The reality of this litigation is that there are simply too many individual issues and class members to try this case efficiently. The manageability problems which would be encountered in litigating and trying this case are staggering. Plaintiffs simply do not offer a workable plan

as to how this litigation would be tried with respect to the numerous individual issues.

Plaintiffs' "Suggested Trial Phase I" simply does not adequately address the manageability problems that ominously loom in this case. In their reply brief, plaintiffs suggest a trial plan that would address the common liability and common damages issue. However, this trial plan proposed by plaintiffs fails to address how the individual issues of addiction, causation and affirmative defenses can be determined on a class–wide basis consistent with the rights of the parties.

Each of these issues would be disputed and therefore would be decided by the jury. Defendants argue that many of these issues can be proven on a class–wide basis through the use of claim forms, statistical random sampling, depositions, expert opinion and court-appointed special masters. (Interrog.Resp.Nos.4, 16, 19, 21, 22, 27, 32–34, 37, 38, 30). However, many of the methods proposed by plaintiffs would abrogate the constitutional rights of defendants. As previously discussed, the use of a questionnaire to determine addiction would be violative of defendants' due process right to a fair trial.

Plaintiffs contend that if the Court were to permit damages to class members, such damages can be determined and awarded on a class–wide basis. Plaintiffs state that proof of such damages can be presented through expert statistical evidence. In making this argument, plaintiffs point to the case of *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir.1996).

The class in *Hilao* was composed of roughly 10,000 persons who had been tortured, summarily executed or "disappeared" by the regime of Marcos. After a liability trial the court permitted damages to be extrapolated to the class as a whole on the basis of 137 claims that were randomly selected and tried. Defendants argued that the method used to compute damages violated their due process rights because the jury did not consider the individual questions of degree of injury, proximate cause, etc. The Court noted that "degree of injury" would have affect-

ed the computation of damages in that case but defendants could not raise this issue because they waived any challenge to the computation of damages.

Applying the reasoning of *Hilao* to this case, the Court finds that plaintiffs would not be permitted to use expert statistical evidence to prove damages. Unlike *Hilao*, defendants in this case do not waive any challenge to the computation of damages. Thus, the "degree of injury," which was not at issue in *Hilao*, will be critically important here. The "degree of injury" which each and every class member suffered would clearly be relevant to the computation of damages and would necessarily entail an individual inquiry. As the Sixth Circuit has stated, "[a]lthough many common issues of fact and law will be capable of resolution on a group basis, individual particularized damages still must be proved on an individual basis." *Sterling*, 855 F.2d at 1200. Therefore, plaintiffs' proposed expert statistical evidence will not assuage the manageability problems raised in this case.

Another factor weighing heavily against class certification is the substantial risk that in order to make this case manageable, the Court will be required to bifurcate issues in violation of the Seventh Amendment. This putative class action is littered with individual issues, such as injury, causation, comparative negligence, affirmative defenses and damages. In order to handle these issues, plaintiffs implicitly suggest that a "second" jury or juries hear these individual issues. Such a proposal would surely violate defendants' constitutional rights.

■ The Seventh Amendment entitles parties to have fact issues decided by one jury and ensures that a second jury will not re-examine those facts.[25] *Castano*, 84 F.3d at 750. The "limitation on the use of bifurcation is a recognition of the fact that inherent in the Seventh Amendment guarantee of a trial by jury is the general right of a litigant to have only one jury pass on a common issue of fact." *Id.* A right which exists in this case

---

**25.** "[N]o fact tried by jury, shall be otherwise re-examined in any Court of the United States...."

U.S. Const. amend. VII.

and precludes the Court from bifurcating any issue that would allow two juries to pass over the same issue twice.

The *Castano* court cogently describes why the issue of comparative negligence could never be bifurcated:

> Comparative negligence, by definition, requires a comparison between the defendant's and the plaintiff's conduct. At a bare minimum, a second jury will rehear evidence of the defendant's conduct. There is a risk that in apportioning fault, the second jury could reevaluate the defendant's fault, determine that the defendant was not at fault, and apportion 100% of the fault to the plaintiff. In such a situation, the second jury would be impermissibly reconsidering the findings of the first jury.

*Id.* at 751 (citations omitted). Because the risk of reevaluation would be so high, it cannot be said with any logic that class certification is superior to individual adjudications in this case.

Another compelling factor that militates against a finding of superiority is that there does not exist "a prior track record of trials from which [this Court] can draw the information necessary to make the . . . superiority analysis required by Rule 23." *See id.* at 747. The *Castano* court stated that "the certification of an immature tort results in a higher than normal risk that the class action may not be superior to individual adjudication." *Id.* As in *Castano*, this Court concludes that the lack of a prior track record of trials in these types of cases makes it practically impossible to draw information necessary to make the superiority analysis.

Plaintiffs argue that the "immature tort" theory should not apply in this case because they proceed on well–established causes of action. As an initial matter, the Court questions plaintiffs' characterization with respect

to the maturity of the causes of action on which they proceed. Plaintiffs' medical monitoring claim and putative intentional exposure to a hazardous substance claim are relatively new causes of action if you consider the history of the development of tort law.[26] Based just on the relative "maturity" of these particular causes of action, the Court could determine that these torts are immature. The concept of the immature tort however goes far beyond this simplistic analysis.

In the context of Rule 23(b)(3), the immature tort theory has a much broader meaning then its mere name would suggest. The immature tort can refer to a new cause of action, or an old cause of action applied to a new situation. *See Id.* at 737; *see also* Recent Case, *Class Certification of Mass Torts—Fifth Circuit Decertifies Nationwide Tobacco Class* : Castano v. American Tobacco Co., 110 Harv. L.Rev. 977, 980 (1997) (opining on the wide variety of meanings that "immature tort" may encompass). For example, in *Castano*, the cause of action was not novel; indeed, the *Castano* plaintiffs proceeded on the ordinary claim that a fraudulent failure to disclose material information resulted in injury to plaintiffs.

The immature nature of the *Castano* plaintiffs' claim arose out of the fact that the plaintiffs were applying old causes of action to a new situation. The new situation was what the *Castano* court called the "addiction–as–injury" theory of liability. In *Castano*, plaintiffs were claiming that defendants' conduct caused them to become addicted to cigarettes, thus exposing them to the enhanced risk of contracting smoking–related diseases. This theory of liability was "novel". Indeed, at the time of *Castano*, no United States Court had ever tried a tobacco suit based on plaintiffs' theory of liability. Because of the novelty of this theory and the lack of prior

---

**26.** A recent, timely article in *The National Law Journal* spoke to this issue:

> The path to acceptance for any cause of action is generally long and arduous.
>
> The process can begin with a new law, a new application of an old law or the development of a new theory, but each cause faces daunting obstacles, particularly in gaining the willingness of judges to allow the cause to proceed.

> Truly new torts are rarely accepted. The now–common tort of insurance bad faith was one of few established this century. The first lawsuits against insurance coverage date back more than 300 years. . . . But it wasn't until 1974, . . . that California became the first state to establish case law delineating bad faith in denials as a separate tort. Margaret Cronin Fisk, *Looking for a New Cause of Action?*, Nat'l L. J., May 19, 1997, at A1.

track record, the court was unable to draw on any information to make its superiority analysis.

In this case, plaintiffs allege that they proceed on a different theory of liability. However, a close reading of plaintiffs' amended complaint indicates that plaintiffs proceed on almost the same theory of liability as did the *Castano* plaintiffs. The plaintiffs' theory of liability directly relies on their being able to prove that cigarettes are addictive, that the class members are addicted, that the defendants knew that the cigarettes were addictive, that despite this knowledge defendants targeted children with advertising for the sole purpose of addicting them, and that defendants' actions were undertaken with the full knowledge that cigarettes contained carcinogens which caused disease. In sum, addiction is central to plaintiffs' theory of liability.

Applying the immature tort theory to this case, the Court finds that plaintiffs cannot demonstrate superiority in this case. The superiority analysis requires a balancing of the merits of the class action against those "alternative available methods," namely individual trials in this case. *See Georgine,* 83 F.3d at 632. Any attempt to make a superiority determination in the absence of a prior track record of individual trials is necessarily based on speculation. *See Castano,* 84 F.3d at 748.[27]

Here, plaintiffs submit that class action treatment is superior to the thousands of individual trials that the courts will be inundated with if a class is not certified. (Pls.' Post–Hr'g Mem. at 8; Pls.' Reply Br. at 51). In essence, plaintiffs contend that precious judicial resources will be preserved if this case is certified as a class action. Plaintiffs' argument is based on pure speculation. As the *Castano* court noted, "[n]ot every mass tort is asbestos, and not every mass tort will result in some judicial crises." *Id.* at 747. The judicial crisis to which plaintiffs allude is only theoretical at this point in time.

Additionally, a major rationale for a finding of superiority—judicial efficiency—is not present in this case. *See Sterling,* 855 F.2d at 1196 ("The procedural device of Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense."). Whether a class action would be more efficient than individual actions goes directly to the heart of the immature tort doctrine.

Even assuming that the courts will be exposed to many more of these types of cigarette cases, "a conclusion that certification will save judicial resources is premature at this stage of the litigation." *Castano,* 84 F.3d at 749. Plaintiffs argue that a class action is superior because if plaintiffs are required to try their cases individually, the issues of defendants' knowledge, intent, or reckless disregard, and defendants' financial capacity, will have to litigated many of thousands of times. This is mere speculation. In the individual trials, it may turn out that the common issues of defendants' conduct is a minor part of each trial, thus producing empirical evidence that common issues are not actually a significant part of these cases. Moreover, what plaintiffs fail to note is that there are also many individual issues involved here which may require thousands of individual mini–trials, even if the case was certified as class action. Thus, there may be no savings but rather a diminution of judicial resources, and thus a reduction in judicial efficiency.

If there existed a prior track record of trials in these types of cases, the Court would be able to make a more accurate determination as to judicial efficiency. The Court could refer to the actual issues and problems that arise in these cases, instead of being forced to speculate as to what these issues and problems may be. Additionally, individual trials in these cases may winnow

**27.** To the extent that *Castano* court concludes that a finding of superiority can never be reached when the case implicates an immature tort, this Court rejects *Castano* as persuasive authority. In some cases where the immature tort theory is involved, plaintiffs could still establish superiority by way of analogy to cases which are similar to that particular case. A court could properly rely on these analogous cases to determine if class action treatment is superior to individual trials.

out many of the individual issues that are now before this Court. *Id.* at 749–50 (finding that in these individual actions, the validity of certain defenses and causes of actions can be determined). After individual trials are conducted in these cases, the courts will have the necessary information to make a thoughtful and logical superiority determination. At this time, however, plaintiffs cannot produce enough information to establish the superiority of a class action.

Finally, one of the main reasons for finding superiority in a class action—the existence of a negative value suit—is absent in this case. *See id.* at 748. *Accord Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 2973, 86 L.Ed.2d 628 (1985); *see also Rhone–Poulenc,* 51 F.3d at 1299. At the certification hearing, plaintiffs' counsel claimed that each class member would be entitled to restitution and punitive damages. The award amount could total approximately $750,000 based just on these restitution and punitive damages. This figure could potentially climb even higher if compensatory damages and the costs of medical monitoring were factored into the equation. Based on these potential damages, the Court cannot conclude that individual lawsuits by the putative class members would be negative value suits.[28]

Based on the foregoing reasons, the Court cannot possibly conclude that a class action in this case would be superior to other available alternative methods.

#### D. Rule 23(c)(4)

This Court may certify issues under Fed.R. Civ. P. 23(c)(4)(A) which provides as follows:

(4) When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues.

Fed.R.Civ.P. 23(c)(4)(A).

In the alternative, plaintiffs request that the Court certify one or more of the common questions set forth in their brief as common issues for class adjudication pursuant to Rule 23(c)(4)(A). Defendants oppose such a certification.

■ Before a district court may certify common issues pursuant to (c)(4), the court must first find that a cause of action, as whole, satisfies the predominance requirement of (b)(3). *Castano,* 84 F.3d at 745 n. 21 (citing *In re N.D. Cal. Dalkon Shield IUD Prods. Liab. Litig.,* 693 F.2d 847, 856 (9th Cir.1982)). After the court determines that (b)(3) has been satisfied as to the whole cause of action, then the court may use (c)(4) as "a housekeeping rule ... to sever common issues for trial." *Id.* At this point in time, plaintiffs have not proven that subsection (c)(4) can be used to sever common issues because they have not established that their causes of action independently satisfy the predominance requirement. Plaintiffs cannot read the predominance requirement out of (b)(3) by using (c)(4) to sever issues until the common issues predominate over the individual issues.

#### III. Conclusion

Today's decision is not in the slightest respect a comment on the merits of plaintiffs' claims; the resolution of the merits of this litigation is reserved for another day. Instead, today's decision is merely a recognition that a class action cannot be properly

---

**28.** At the hearing, plaintiffs argued that these suits were negative value suits because medical monitoring examinations would only cost approximately $2000 per year per person. However, plaintiffs undermine this argument by conceding that they are also seeking restitution and punitive damages (the plaintiffs also actually seek compensatory damages in the form of treatment pursuant to the medical monitoring program).

Plaintiffs also advance another duplicitous argument. On the one hand, plaintiffs argue that they cannot possibly litigate these medical monitoring claims against defendants due to defendants' overwhelming financial position. Plain-

tiffs claim that it is "David versus Goliath." This argument however is a tad disingenuous. First, in making their superiority argument, plaintiffs contend that the courts will be flooded with thousands of these suits. An admission that these cases are financially worth pursuing in the courts. Second, plaintiffs are represented by a nation–wide consortium of more than sixty well–financed law firms. There thus really does not appear to be a significant financial disparity in the parties' ability to finance these putative litigations. Thus, what this Court and other courts similarly situated are faced with is "Goliath versus Goliath."

certified in any case unless the requisites of Rule 23 are satisfied. Additionally, today's decision is also an acknowledgement that the substantive rights of the parties cannot be compromised in any respect by the imprudent certification of a class action.

Accordingly, for the foregoing reasons, plaintiffs' motion for class certification is denied.

An appropriate Order follows.

### ORDER

AND NOW, this 3rd day of June, 1997, upon consideration of plaintiffs' Motion for Class Certification, and defendants' response thereto, and plaintiffs' reply thereto, and the parties' post–hearing memoranda, and the parties' supplemental briefs, and the various exhibits in support of the aforementioned, and oral argument heard in open court at the class certification hearing held on March 6, 1997, it is hereby ORDERED that said Motion is DENIED.

AND IT IS SO ORDERED.